# In the United States Court of Federal Claims

No. 19-683 C
(Filed: August 31, 2021)

```
* * * * * * * * * * * * * * * * * * *
                                    *
RYAN P. SLAUGHTER,                  *
                                    *
                   Plaintiff,       *
                                    *
        v.                          *
                                    *
THE UNITED STATES,                  *
                                    *
                   Defendant,       *
                                    *
and                                 *
                                    *
SC JONES SERVICES, INC.,            *
                                    *
                   Defendant-Intervenor.  *
                                    *
  * * * * * * * * * * * * * * * * ***
```

*Ryan P. Slaughter*, *pro se*, of Roy, WA.

*Isaac B. Rosenberg*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, D.C., for defendant.

*Kathryn V. Flood*, PilieroMazza PLLC, of Washington, D.C., for defendant-intervenor.

## OPINION AND ORDER

**SOMERS**, Judge.

On May 8, 2019, Plaintiff *pro se* Ryan P. Slaughter, doing business as Allied Synergy International ("ASI"), filed a complaint in this Court challenging the National Aeronautics and Space Administration's ("NASA") award of a contract in October 2018 to SC Jones Services, Inc. ("Defendant-Intervenor" or "SC Jones"), for grounds maintenance and pest control services at John F. Kennedy Space Center. ECF No. 1 ("Compl.").[1] Plaintiff objects to NASA's price

---

[1] Plaintiff filed an amended complaint on May 17, 2019, that—for all relevant parts—largely restates his original grounds for objecting to NASA's award of the contract to SC Jones. ECF No. 11 ("Amend. Compl.").

evaluation methodology, namely its alleged use of "a different equation and formula which [NASA] did not specifically state in writing in the solicitation to evaluate for award." *Id*. at 2. Plaintiff asserts that his "firm provided the [Lowest Price Technically Acceptable] bid with the equation the agency awarded to" and, for relief, "humbly request[s] an award of this contract" from the Court. *Id*. at 2-3.

On June 27, 2019, Plaintiff filed a motion for judgment on the administrative record, ECF No. 28 ("Pl.'s MJAR"), to which the government filed a cross motion, ECF No. 31 ("Gov.'s Mot. to Dismiss/MJAR"). In addition, the government moved to dismiss the complaint pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"). Gov.'s Mot. to Dismiss/MJAR. On January 4, 2021, the case was reassigned to the undersigned judge. The case has been thoroughly briefed,[2] and the Court provided multiple opportunities for the parties to state, argue, or further clarify their positions on the record.[3] For the reasons that follow, the Court has determined that Plaintiff fails to satisfy standing requirements under the Tucker Act to bring this bid protest. Accordingly, the Court lacks jurisdiction to consider the merits of Plaintiff's complaint, and the government's motion to dismiss is granted.

## BACKGROUND AND PROCEDURAL HISTORY

### A. The Solicitation

On June 6, 2018, NASA issued a request for proposals ("RFP" or "solicitation"), via Solicitation No. 80KSC018R0014, for the award of a firm-fixed price contract ("KGPC II") to provide grounds maintenance and pest control services at John F. Kennedy Space Center on Merritt Island, Florida. Gov.'s Mot. to Dismiss/MJAR at 2. SC Jones was the incumbent under the predecessor contract. *Id*. "The solicitation sought a contract consisting chiefly of two firm-fixed price contract line item numbers (CLINs) for regularly-scheduled grounds maintenance and pest control services . . . and a third, indefinite delivery/indefinite quantity (IDIQ) CLIN encompassing 16 irregular (but related) services to be ordered at fully-burdened, firm-fixed price rates." *Id*. at 2-3 (citation omitted). It also included a firm-fixed price CLIN for phase-in activities. *Id*. at 3.

The solicitation contemplated a contract of up to five years in length, consisting of a base year and four, one-year options, which NASA would award "on a Lowest Price Technically Acceptable [LPTA] basis." *Id*. (quoting AR 123 (emphasis omitted)). The evaluation process consisted of NASA initially evaluating each offeror's proposed price to determine which was the lowest, after which it would "evaluate the lowest priced proposal first" to determine whether it

---

[2] Numerous other motions (including at least one largely duplicative non-motion that is designated as a motion) filed by Plaintiff remained pending on the docket at the time the case was transferred to the undersigned judge. *See* ECF No. 35, 54, 65, 72, 73, and 75. The Court thoroughly reviewed each and found no new information relevant to the issue of standing, which must be established before the Court can consider the merits of a case.

[3] The docket reflects telephonic status conferences held on May 10, 2019, ECF No. 5, and on August 27, 2019, ECF No. 38, as well as telephonic oral argument on the motions held on September 23, 2019, ECF No. 52.

met technical acceptability.  AR 123.  If "the lowest priced proposal" was found to be "not technically acceptable," NASA would evaluate "the second lowest priced proposal" for technical acceptability, and so on "until the lowest priced technically acceptable proposal [was] identified."  *Id*.  For technical acceptability, the solicitation identified six factors NASA would assess: recent relevant experience, project manager experience, certifications/licenses, union labor experience, resources, and phase-in.  AR 123-125.  To be found technically acceptable, a proposal had to "meet" all six factors.  AR 123.

To determine a total evaluated price "for award purposes," the solicitation provided that NASA would use the sum of each offeror's "total price for the basic requirement," "phase-in pricing," and "total price for all options . . . ."  AR 126.  Such prices would be "determin[ed] . . . by multiplying the unit price" for each requirement by "the quantities specified for each year . . . ."  *Id*.  Moreover, the agency would evaluate price proposals for completeness and "any significant unbalanced pricing," consistent with Federal Acquisition Regulation ("FAR") § 15.404-1(g).  *Id*.  An offeror's proposal could "be rejected if the Contracting Officer determines that pricing information is incomplete."  *Id*.

The solicitation required each offeror's price proposal to include two completed tables— Table B.1-1 and Table B.3-1—from "Section B" of the solicitation, as well as a completed price proposal template, labeled Attachment L-01.  Gov.'s Mot. to Dismiss/MJAR at 4 (citing AR 122); *see also* AR 54-57, 382-83.  It directed offerors to "complete Contract Line Item Pricing" in both tables and the price proposal template, AR 122, as well as to "reconcile" their pricing tables with the price proposal template, AR 54 (requiring that Table B.1-1 "be completed by the Offeror" and that it "should reconcile to attachment L-01").  *See also* AR 57 (requiring that Table B.3-1 "be completed by the offeror"); AR 122 ("Attachment L-01 . . . shall reconcile to Table B.1-1 and Table 3.1-1.").

Table B.1-1 consisted of seven pricing sub-tables requiring offerors to submit a fixed price for one month of phase-in activity and total annual fixed prices for "Grounds Mowing and Landscaping" (CLIN 0001 for "Base Period," CLIN 1001 for "Option 1," et seq.) and "Pest Control" (CLIN 0002 for "Base Period," CLIN 1002 for "Option 1," et seq.).  AR 54-56.[4]  It also required offerors to propose an annual "unit price" for the IDIQ CLINs for each year—base through Option 4.  *Id*.  For each year, the sub-tables included a notation that the annual "Amount" for each of the IDIQ CLINs was not-to-exceed $300,000 ("NTE $300,000"), reflecting an annual cap on NASA's authority to order the 16 irregular services covered by those CLINs.  Gov.'s Mot. to Dismiss/MJAR at 4-5; AR 54-56.

Specifically, Table B.1-1 appears in the solicitation as follows (shown here with only the base period sub-table reflected, but the four sub-tables for the option periods are identical to that of the base period):

---

[4] Each total "Amount" for grounds and pest control services was determined by the offeror providing a monthly "Unit Price," which was multiplied by the offeror by twelve to arrive at an annual "price" for such CLINs.

## PART I – SCHEDULE

## SECTION B – SUPPLIES OR SERVICES AND PRICE/COST

### B.1     Supplies or Services/Prices

The Contractor shall provide all resources (except as may be expressly stated in the contract as furnished by the Government) necessary to perform the requirements set forth in the KSC Grounds and Pest Contract II (KGPC II) Performance Work Statement (PWS) incorporated as attachment J-01.

### Table B.1-1 Schedule of Services

*(To be completed by the Offeror, should reconcile to attachment L-01)*

| Phase-In | | | | | |
|---|---|---|---|---|---|
| **CLIN** | **DESCRIPTION OF SUPPLIES or SERVICES** | **QTY** | **UNIT** | **UNIT PRICE** | **AMOUNT** |
| 0000 | Phase-In Activities | 1 | Month | | |
| | **Total for Phase-In Period** **(09/01/18 – 09/30/18)** | | | | |

| Base Period | | | | | |
|---|---|---|---|---|---|
| **CLIN** | **DESCRIPTION OF SUPPLIES or SERVICES** | **QTY** | **UNIT** | **UNIT PRICE** | **AMOUNT** |
| 0001 | Grounds Mowing and Landscaping | 12 | Month | | |
| 0002 | Pest Control | 12 | Month | | |
| 0003 | ID/IQ – See Table B.3-1 | 1 | Yr | | NTE $300,000 |
| | **Total for Base Period** **(10/01/18 – 09/30/19)** | | | | |

AR 54; *see* AR 55-56 for option periods.

Section B also required offerors to complete a "Summary" sub-table in Table B.1-1, providing a "Total for Phase-In, Base Period and Option 1 thru Option 4 and ID/IQ Schedule (All Years)." AR 56. The sub-table appears in the solicitation as follows:

| SUMMARY – Phase-In, Base Period and Option 1 thru Option 4 | | | | | |
|---|---|---|---|---|---|
| **CLIN** | **DESCRIPTION OF SUPPLIES or SERVICES** | **QTY** | **UNIT** | **UNIT PRICE** | **AMOUNT** |
| | Phase-In Period | | | | |
| 0 | KGPC II Base Period | | | | |
| 1 | KGPC II Option Period 1 | | | | |
| 2 | KGPC II Option Period 2 | | | | |
| 3 | KGPC II Option Period 3 | | | | |
| 4 | KGPC II Option Period 4 | | | | |
| **Total for Phase-In, Base Period and Option 1 thru Option 4 and ID/IQ Schedule (All Years)** | | | | | |

*Id.*

Next, Table B.3-1 required offerors to specify firm-fixed unit prices (i.e., per acre, per tree, or per hour) for the various IDIQ services, with boxes for each performance period ("Base Period," "Option 1," et seq.). AR 57. The solicitation made clear that the IDIQ prices would "be used by the Government in ordering additional requirements as needed." AR 56. Specifically, the table appears in the solicitation as follows:

**Table B.3-1 ID/IQ/FFP Rates**

*(To be completed by the offeror)*

| ID/IQ CLIN | Services | Reference | Qty | Base Period | Option 1 | Option 2 | Option 3 | Option 4 |
|---|---|---|---|---|---|---|---|---|
| 0003a | Mowing Near Buildings | Attachment J-09.1 | Acre | $ | $ | $ | $ | $ |
| 0003b | Mowing Roadways and Open Fields | Attachment J-09.2 | Acre | $ | $ | $ | $ | $ |

| | | | | $ | $ | $ | $ | $ |
|---|---|---|---|---|---|---|---|---|
| 0003c | Maintain/trim Tree – Small | Attachment J-01 Sect 2.6 & 4.1 | Each | $ | $ | $ | $ | $ |
| 0003d | Maintain/trim Tree – Medium | Attachment J-01 Sect 2.6 & 4.1 | Each | $ | $ | $ | $ | $ |
| 0003e | Maintain/trim Tree - Large | Attachment J-01 Sect 2.6 & 4.1 | Each | $ | $ | $ | $ | $ |
| 0003f | Tree Removal – Small | Attachment J-01 Sect 4.1 | Each | $ | $ | $ | $ | $ |
| 0003g | Tree Removal – Medium | Attachment J-01 Sect 4.1 | Each | $ | $ | $ | $ | $ |
| 0003h | Tree Removal – Large | Attachment J-01 Sect 4.1 | Each | $ | $ | $ | $ | $ |
| 0003i | Emergency Clean Up | Attachment J-01 Sect 4.5 | Hour | $ | $ | $ | $ | $ |
| 0003j | Fire Line Clearing | Attachment J-01 Sect 4.4 | Acre | $ | $ | $ | $ | $ |
| 0003k | Land Clearing | Attachment J-01 Sect 4.3 | Acre | $ | $ | $ | $ | $ |
| 0003l | Pest Control | Attachment J-01 Sect 4.6 | Hour | $ | $ | $ | $ | $ |
| 003m | Pest Control – residual Mosquito | Attachment J-01 Sect 4.6 | Acre | $ | $ | $ | $ | $ |
| 003n | Pest Control – Mosquito Fogging | Attachment J-01 Sect 4.6 | Acre | $ | $ | $ | $ | $ |
| 003o | Landscaping | Attachment J-01 Sect 2.3 | Acre | $ | $ | $ | $ | $ |
| 003p | Repair and Replacement of Grass Area | Attachment J-01 Sect 4.2 | Acre | $ | $ | $ | $ | $ |

AR 57.

Attachment L-01, the price proposal template, consisted of two Excel spreadsheets, requiring the offeror to provide discrete pricing information for each CLIN.  AR Tab 31.   In the first spreadsheet, for each firm-fixed price CLIN, offerors were required to separately list their proposed labor, material, and equipment pricing during each performance period.  AR 382.  It also required offerors to provide unit-level rates for each of the 16 IDIQ CLINs.  *Id*.  In the second spreadsheet, the agency included estimated "Frequency Per Year" information for each IDIQ service, which the spreadsheet then multiplied by the offeror's proposed rates from the first spreadsheet to determine the price per service for each performance period, the "Total ID/IQ Price" for each IDIQ CLIN over the entire contract (base year and all options), and a sum "Total ID/IQ Evaluation Price."  *Id*.  Using all of the offeror-supplied pricing information, the second spreadsheet calculated a sum of all firm-fixed price amounts for all performance periods, the

"Total ID/IQ Evaluation Price," and the offeror's "Phase-In" price to calculate the offeror's "Total Evaluated Price (Base, Options, ID/IQ & Phase-in)." AR 383. The top of both spreadsheets stated, "**PRICE TEMPLATE BELOW IS FOR EVALUATION PURPOSES ONLY**," and the bottom of each provided, "**This price evaluation template must be completed and included in the proposal**." *Id*.

Overall, the solicitation made clear the importance of offerors submitting complete proposals for consideration:

> **L.15   Proposal Content**
>
> Offerors are requested to provide information responsive to the items set forth in RFP section L and section M. This information is considered essential for the Government to conduct a fair and uniformed evaluation of proposals in accordance with the evaluation factors provided in section M. . . .
>
> Proposals will be evaluated on the completeness and quality of the information provided to demonstrate the offeror's qualifications in terms of experience, capability, and proposed approaches to meet all of the requirements of the [Performance Work Statement].

AR 120.[5]

**B.  Offers, Evaluation, and Award**

In response to the solicitation, NASA timely received four proposals by the July 18, 2018 deadline, including from Plaintiff, AR Tabs 39-50, and SC Jones, AR Tabs 51-55. *See also* Contracting Officer's Statement of Facts at 5, 10 (AR 13, 18). In a document dated July 19, 2018, the Contracting Officer compiled an "Abstract of Offers," indicating for each offeror whether the proposal was timely, whether the offeror qualified as a HUBZone small business,[6] whether the proposal complied with page limitations, and whether the proposal included the "Volume II Price Proposal Template." AR Tab 56. The abstract also identified whether each offeror "Completed SF 1449 Schedule Table B.1-1 & Table B.3-1." *Id*. Three of the four offerors, including the awardee SC Jones, were marked "Yes" for having "[c]ompleted" Tables B.1-1 and B.3-1 in their proposal; Plaintiff, however, was marked "No." *Id*. Specifically, the abstract appears in the Administrative Record as follows:

---

[5] Section M of the solicitation includes the "Evaluation Factors for Award," including those for "Volume II – Price." AR 126.

[6] The solicitation limited proposals to qualifying historically underutilized business zone ("HUBZone") small businesses. AR 115.

ABSTRACT OF OFFERS                                    SOLICITATION NO. 80KSC018R0014 (KGPC II)

|   | Name of Offeror | Timely 7/18/18 4:30 PM | HUBZone Small Business | Reps & Certs or SAM | Volume I Technical Capability Proposal Pages (NTE 20) | Volume II Price Proposal Template | Completed SF 1449 Schedule Table B.1-1 & B.3-1 | Total Evaluated Price |
|---|---|---|---|---|---|---|---|---|
| 1 | S C Jones | Yes | Yes | Reps & Certs | 19 Pages | Yes | Yes | $10,048,182.00 |
| 2 | Allied Synergy International | Yes | Yes | SAM | 13 Pages | Yes | No | $10,400,000.00 |
| 3 | [Offeror 3] | Yes | Yes | SAM | 16 Pages | Yes | Yes | [***] |
| 4 | [Offeror 4] | Yes | Yes | Reps & Certs | 21 Pages | Yes | Yes | [***] |

*Id.*[7]

The abstract ranked the offers from lowest to highest based on each offeror's "Total Evaluated Price." *Id.*; *see also* AR 747. Of the four offers, SC Jones is shown as the lowest bidder with a "Total Evaluated Price" of $10,048,182, and Plaintiff is shown as the second lowest bidder at $10,400,000. *Id.*[8] Next:

> After determining that S.C. Jones was the lowest total evaluated price for purposes of award and had submitted the required documentation, the Contracting Officer then forwarded S.C. Jones' Volume I, Technical Capability Proposal to the technical evaluators. During that time, the Contracting Officer also executed a Price Reasonableness memorandum having determined S.C. Jones' price as fair and reasonable based on adequate price competition and the Government's Independent Cost Estimate.

AR 19 (citing AR Tab 60).

On August 8, 2018, after SC Jones' proposal had been found technically acceptable, the Contracting Officer "executed a Selection Statement having found S.C. Jones as the lowest priced technically acceptable offer and therefore eligible for award in accordance with RFP evaluation criteria." *Id.*; *see also* AR Tab 62 (Source Selection Statement). Pre-award notifications were issued on August 13, 2018, to the unsuccessful offerors, including Plaintiff, and, on October 18, 2018,[9] the award notice was posted on the Federal Business Opportunities ("FBO") webpage. *Id.* According to the Contracting Officer,

---

[7] For inclusion in this opinion, the table includes redactions that the Court deemed necessary (indicated by "[***]," as well as generic identifiers for Offeror 3 and Offeror 4. The Court also notes that the table is included in landscape format in the record. *See* AR 746. To fit this opinion for publication, the cells are recreated here in portrait format, but all substantive information remains identical to the original source.

[8] "The evaluated price for purposes of award did not include the ID/IQ NTE price as the NTE was not part of the evaluation criteria set forth in Section M or provided as a fill in cell on the L-01 Pricing Template." AR 19 (Contracting Officer's Statement of Facts at 11).

[9] As explained in the Contracting Officer's Statement of Facts:

> The Agency's delay in announcing the award resulted from [Plaintiff's] submission of a [HUBZone] size protest to the Small Business Administration ("SBA") on August 15, 2018. The

> [t]he FBO award notice contains a "contract award dollar amount" of
> $10,974,544; an amount different from awardee's $10,048,182 total evaluated
> price for award purposes. Per NASA FAR Supplement (NFS) Subpart 1805-3,
> NASA is required to post for public announcement contract actions with an
> "anticipatory value" of greater than $7 million[.]   For purposes of award
> announcement, "anticipatory value" is defined as the total maximum value under
> an indefinite quantities contract.  This "anticipatory value" or "contract award
> amount" was arrived at by removing S.C. Jones' ID/IQ evaluated price for
> purposes of award ($411,810) and adding back in $1.5 million ($300,000 NTE
> price per year time[s] five years (base year plus 4 one year options)) which is the
> maximum amount of ID/IQ that could be awarded under the contract.  It is not the
> total evaluated price for purposes of award set in the RFP Section M evaluation
> criteria.

AR 19-20 (citations omitted).

## C.  GAO Protest and the Instant Case

On October 22, 2018, Plaintiff filed a protest with the Government Accountability Office
("GAO") challenging NASA's award to SC Jones.  AR 20.  Before GAO, Plaintiff alleged that
NASA violated the terms of the solicitation by using evaluated IDIQ CLIN prices for purposes
of awarding the contract, as opposed to using $300,000 (which Plaintiff derives from the "NTE
$300,000" IDIQ CLIN notation in Table B.1-1) for the annual IDIQ CLIN prices.  *Matter of:
Ryan P. Slaughter DBA Allied Synergy Int'l*, B-417036 (Jan. 16, 2019).  In other words, Plaintiff
objected to NASA's use of evaluated IDIQ prices to *award* the contract, because the agency's
*announcement* of the contract award (and value) reflected the NTE amount instead.  Plaintiff
claimed he "would have had the lowest evaluated price, and should have received the award, if
NASA had calculated offerors' proposed prices correctly—which, according to [Plaintiff], meant
using the $300,000 NTE figure as the price for all the IDIQ CLINs."  Gov.'s Mot. to
Dismiss/MJAR at 12.  Under that formula, Plaintiff's price would be $10.75 million, compared
to SC Jones' price of $10.97 million.  *Matter of: Ryan P. Slaughter DBA Allied Synergy Int'l*, B-
417036 (Jan. 16, 2019).  Ultimately, GAO concluded that NASA's "use of the estimated
quantities specified in the RFP to calculate evaluated prices for IDIQ CLINs, rather than using
the higher not-to-exceed limit, was required by the RFP," and that Plaintiff "[had] not shown that
the price evaluation used by NASA was unreasonable, or that it was prohibited by law or
regulation."  *Id*.

---

SBA denied the protest on September 19, 2018.  On September 20, 2018, [Plaintiff] filed an
appeal . . . .  That appeal was denied on October 15, 2018.

AR 19, n.3.

Plaintiff initiated the instant action on May 8, 2019, alleging essentially the same grounds for relief as his protest at GAO.  *See* Pl.'s MJAR at 23 ("My firm provided the lowest price utilizing the same equation (Phase in + Grounds + Pest Control + IDIQ NTE $300,000) the agency awarded to my competitor from, but he received the award and I did not. That is just plain wrong.").  Plaintiff also articulates several other objections, including that NASA "incorrectly interpreted [48 C.F.R. § 15.101-2] to mean they could choose an awardee based on an evaluated equation and award to that contractor using a different equation," *id*. at 5, that NASA "did not provide a coherent and reasonable explanation of its exercise of discretion," *id*. at 8, that because "multiple contractors had difficulty submitting quotes on this procurement[,] [it is] obvious there was a significant error in the procurement process," *id*. at 13 (emphasis omitted), that the solicitation contained "hidden figures" subject to "manipulations," *id*. at 29, and that NASA may have "unlawfully engage[d] in communications, clarifications, and instruction to [SC Jones] about how to 'correctly' submit its bid schedule," *id*. at 38, among other allegations of agency error.[10]

In July 2019, the government responded with its motion to dismiss, cross-motion for judgment on the administrative record, and opposition to Plaintiff's motion.  The government's motion argues for dismissal on the grounds that Plaintiff "lacks standing because his proposal was incomplete and noncompliant with the requirements stated in the solicitation."  *Id*. at 16.  According to the government, the solicitation "required offerors to include several documents in their price proposals, including 'Table B.1-1 and Table B.3-1,'" but "[Plaintiff] included neither."  *Id*.[11]  In addition, the government asserted that the complaint should be dismissed based on the Federal Circuit's holding regarding waiver in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).  According to the government, Plaintiff "challenges various aspects of the solicitation and its contents that he either knew or should have known about before he submitted his proposal," and "these protest grounds have been waived because [Plaintiff] failed to protest them sooner."  *Id*. at 17.  Finally, the government moved for judgment on the administrative record, arguing, *inter alia*, that NASA properly used evaluated prices to determine that SC Jones had the lowest-priced proposal, correctly did not use the "NTE $300,000" figure in determining evaluated prices, rationally chose to determine the lowest price proposal by considering "Total ID/IQ Evaluated Prices," appropriately communicated with SC Jones, and that contract values may properly differ from evaluated prices.  *Id*. at 23-39.[12]

---

[10] On March 2, 2020, Plaintiff filed a "Renewed and Amended Motion for [Judgment] on the Administrative Record," ECF No. 65, wherein he alleges an organizational conflict of interest ("OCI") that should have prevented the award from ever being made to SC Jones in the first place.  Plaintiff "requests a court order to terminate [SC Jones'] contract . . . and to award the contract to [Plaintiff] its rightful owner. This will effectively and efficiently mitigate and neutralize the OCI."  ECF No. 65 at 15.

[11] The government's standing argument further alleges that Plaintiff's "technical proposal was also both noncompliant and incomplete," in that Plaintiff "did not submit his technical proposal in a single volume but instead across several disjointed attachments," and because it "did not address at least three of the technical factors . . . ."  Gov.'s Mot. to Dismiss/MJAR at 17 (citations omitted).  However, after a correction of the Administrative Record, the government withdrew "that part of our motion [to dismiss]" because Plaintiff had indeed "attached several files addressing those three technical evaluation factors" in a July 17, 2018 e-mail to the Contracting Officer.  ECF No. 37 at 1 (citing AR Tab 39a at 626.1-.21).

## DISCUSSION

### A.  Legal Standard

The Tucker Act provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  In such actions, the Court "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."  28 U.S.C. § 1491(b)(4).  Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706.

Under such review, an "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted).  On the first ground, "the courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  *Id.* (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Thus, the Court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, . . . and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  *Id.* at 1332-33 (citations and quotes omitted).  On the second ground, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."  *Id.* at 1333 (citation and quote omitted).

In addition, "[t]o prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process."  *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999).  To establish prejudice, a plaintiff is "required to show that there was a 'substantial chance' it would have received the contract award but for the [agency's] errors in the bid process."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (citations omitted).

However, before the Court can proceed to the merits of a bid protest, a protestor must first establish that it has standing.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) ("[T]he party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]"); *Castle v. United States,* 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("Standing is a threshold jurisdictional issue, which . . . may be decided without addressing the merits of a determination.").  In bid protests, standing is framed by 28 U.S.C. § 1491(b)(1), which "imposes more stringent standing requirements than Article III" of the Constitution.  *Weeks Marine, Inc. v.*

---

[12] The government also argues that the Court should not grant Plaintiff's motion for judgment on the administrative record, in part because Plaintiff "seeks two improper forms of relief": an award of the contract and lost profits.  Gov.'s Mot. to Dismiss/MJAR at 39.

*United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). Bid protest standing "is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract." *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). Accordingly, to proceed in a bid protest, a plaintiff "is required to establish that it '(1) is an actual or prospective bidder and (2) possess[es] the requisite direct economic interest.'" *Weeks Marine, Inc.*, 575 F.3d at 1359 (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006)). "To prove a direct economic interest as a putative prospective bidder, [the bidder] is required to establish that it had a 'substantial chance' of receiving the contract." *Rex Serv. Corp.*, 448 F.3d at 1308; *see also Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("To establish prejudice, [plaintiff] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process.").

Relevant to the instant matter, plaintiffs proceeding *pro se* are entitled to a liberal construction of their pleadings. *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (requiring that allegations contained in a *pro se* complaint be held to "less stringent standards than formal pleadings drafted by lawyers"). Nevertheless, all plaintiffs still bear the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

## B. Analysis

Plaintiff has firmly established on the record his objections to NASA's award of the contract to SC Jones. What Plaintiff has failed to establish, however, is standing in this Court to protest such award in the first place. First, as the government correctly identifies in its motion to dismiss, Plaintiff submitted an incomplete, and thus noncompliant, proposal in pursuit of the contract. Second, the requirements that Plaintiff failed to follow were material to the solicitation and the agency's price analysis. Third, as Plaintiff failed to follow a material requirement of the solicitation, he has not shown that he stood a "substantial chance" of receiving the contract and, therefore, does not have standing. Accordingly, the Court does not proceed to consider the merits of Plaintiff's objections and must dismiss his complaint for lack of subject matter jurisdiction.

### 1. Plaintiff's Proposal Failed to Comply with the Solicitation's Requirements

The Court begins with a brief review of the unambiguous requirements of NASA's solicitation. As already described above in detail, the solicitation expressly required offerors' proposals to include two "completed" tables from Section B of the solicitation (Table B.1-1 and Table B.3-1) and a completed price proposal template (Attachment L-01). AR 54, 57. It directed offerors to "complete Contract Line Item Pricing" in both tables and the price proposal template, AR 122, as well as to "reconcile" their pricing tables with the price proposal template, AR 54. *See also* AR 122 ("Attachment L-01 . . . shall reconcile to Table B.1-1 and Table 3.1-1."). What is more, the solicitation expressly stated: "A cost/price volume that is *suitable for*

*evaluation* shall . . . (i) Complete Standard Form 1449 Schedule: Table B.1-1 and Table B.3-1." AR 122 (emphasis added).

Proceeding to review Plaintiff's proposal for these required tables, the Court first notes that the Administrative Record reflects that Plaintiff completed the price proposal template, referenced as Attachment L-01. The Contracting Officer's "Abstract of Offers" attests to the same. *See* AR Tab 56. But, as has been established above, Attachment L-01 was not the only pricing information expressly required by the terms of the solicitation. In her "Abstract of Offers," dated July 19, 2018, the Contracting Officer identified that Plaintiff had *not* "Completed SF 1449 Schedule Table B.1-1 & B.3-1" in his proposal. *Id.* This failure to complete and provide the required information places Plaintiff's proposal in stark contrast to those of the other three offerors competing for the solicitation—each of which, per the "Abstract of Offers," completed the B.1-1 and B.3-1 requirement. *See* AR 678-681 (SC Jones), AR 1042-1044 (Offeror 3), AR 1112-1115 (Offeror 4).

Not simply resting on the Contracting Officer's word, the Court searched the record for Plaintiff's missing price tables.[13] They indeed appear, but only belatedly and not as part of the Administrative Record, which compiled the materials that were before NASA when it made its procurement decision. Rather, the required tables appeared for the first time as attachments to Plaintiff's August 2019 response and opposition in this Court to the government's motion to dismiss. ECF No. 35 at Bates 66-69. In that same filing, Plaintiff admits and concedes his "failure to complete the bid schedule in B.1," *id.* at 5, and represents to the Court that "[y]esterday, 8-19-19, I submitted documentation in which I filled out my B.1 table *for the first time*," *id.* at 36 (emphasis added). The Court cannot ignore the obvious: Plaintiff failed to complete and timely submit the required pricing information with his proposal, a failure that he himself has admitted and conceded on the record in this proceeding.

### 2. The Solicitation's Price Information Requirements Are Material

The only question that remains is whether the express requirement to complete Tables B.1-1 and B.3-1 is material to the solicitation and, if so, how Plaintiff's failure to satisfy this requirement bears on the issue of prejudice—an essential element of the Court's standing inquiry. "[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) (citation omitted); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) ("To be acceptable, a proposal must

---

[13] On August 23, 2019, the government corrected the Administrative Record by filing attachments from an email from Plaintiff to the Contracting Officer sent July 17, 2018, the day before the solicitation's deadline. *See* ECF No. 36-2. While the attachments—purporting to be Plaintiff's original proposal—appear relevant to Plaintiff's technical evaluation, they do not answer the question about his missing price tables. Moreover, the government makes clear that "our correction of the administrative record does not change our standing arguments. [Plaintiff's] price proposal was still incomplete." ECF No. 37 at 2.

represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals.").

To refresh, the solicitation specifically states that "[p]rice proposals will . . . be evaluated for completeness," and "a proposal may be rejected if the Contracting Officer determines that pricing information is incomplete." AR 126. Moreover, offerors' pricing information was described within the solicitation as "*essential* for the Government to conduct a fair and uniformed evaluation of proposals in accordance with the evaluation factors provided in section M." AR 120 (emphasis added). The Court will not read out of the solicitation the agency's own determination that the B.1-1 and B.3-1 price information—which, again, was "to be completed by the offeror"—is "essential" for proposal evaluation purposes. There is no ambiguity here. The solicitation expressly demands completed pricing tables from offerors; therefore, the Court must give the language its clear effect. *See CW Gov't Travel, Inc. v. United States*, No. 21-1354 C, 2021 WL 3085500, at *6 (Fed. Cl. June 28, 2021) ("The Court's interpretation of a solicitation's terms begins with the plain language of the document . . . which 'must be given that meaning that would be derived from the [solicitation] by a reasonably intelligent person acquainted with the contemporaneous circumstances'") (quoting *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999)) (internal citation omitted).

The "essential" and material nature of the Table B.1-1 and Table B.3-1 price information, as reconciled to Attachment L-01, is also evidenced by the agency's "Price Reasonableness Determination," dated July 23, 2018. AR Tab 60. Therein, the Contracting Officer presents a "Comparison with Independent Government Estimate (IGE)" of SC Jones' price proposal, using a year-by-year measure of variance and concluding that SC Jones' "prices are reasonable." *Id.* Table B.1-1 of the solicitation in particular—one of the tables of which Plaintiff admits he did not complete—appears to be the very framework by which the agency determines the baseline year-by-year prices from each offeror, with sub-tables dedicated to the "Base Period" and each successive option period. *See* AR 54-56. Moreover, the agency's "Price Reasonableness Determination" specifically reinforces that the agency's "requirement for the IDIQ items is NTE $300,000 per year," which "*was stated on the proposal Section B, Table B.1-1 Schedule of Services*." AR 752 (emphasis added).

In sum, the record points only to a conclusion that *completed* price information in Tables B.1-1 and B.3-1 is a *material* requirement of the solicitation. In so holding, the Court does not tread new ground. In *ManTech Advanced Sys. Int'l, Inc. v. United States*, the Court outlined numerous instances in which it "has determined . . . that proposals with missing mandatory price information contain *material errors*, even when the price information has a minimal impact [on] the total price, so long as the needed prices will be considered in the evaluation process and binding on the offeror." 141 Fed. Cl. 493, 512 (2019) (emphasis added). In the instant case, the Court need not chart its own course to weigh the importance of the requested price information; the agency itself makes it abundantly clear: "A cost/price volume that is **suitable for evaluation shall** . . . (i) **Complete** Standard Form 1449 Schedule: Table B.1-1 and Table B.3-1." AR 122

(emphases added).[14]  Because Plaintiff entirely failed to complete the pricing tables that would have rendered his proposal "suitable for evaluation," the Court cannot find that Plaintiff stood a "substantial chance" of receiving the contract.[15]  Accordingly, Plaintiff fails to establish standing in this Court and his complaint must be dismissed.[16]

## CONCLUSION

For the foregoing reasons, Plaintiff fails to establish that he has standing to bring the instant protest.  Accordingly, the case is hereby **DISMISSED** for lack of subject matter jurisdiction.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge

---

[14] For good measure, consider an alternate hypothetical.  Had Plaintiff been awarded the contract, it is reasonable to assume that one (if not more) of the other three offerors would challenge the award as arbitrary and capricious, as Plaintiff was the *only* offeror who submitted a proposal *not* "suitable for evaluation" on its face.  For Plaintiff to prevail in this hypothetical scenario, the Court would have to disregard the solicitation's clear and express requirements, even though all other offerors complied with them.  Such an outcome would hardly engender public confidence in the procurement process.  *See CW Gov't Travel, Inc. v. United States*, No. 21-1354 C, 2021 WL 3085500, at *25 (Fed. Cl. June 28, 2021) ("It is paramount that GSA—as with any agency—abide by the terms of its RFQ and the FAR in order to maintain public confidence in the procurement process.").

[15] The Court notes that Plaintiff has not himself articulated a clear argument for standing, nor directly responded in his numerous briefings to the government's arguments as to the missing price information and its impact on standing.  When standing is mentioned, Plaintiff quickly proceeds instead to the merits of his protest.  *See* ECF No. 35 at 15-17.  Nevertheless, consistent with the Court's duty to grant *pro se* plaintiffs a liberal construction of their pleadings, the Court endeavored to find anything in the record that might salvage Plaintiff's standing in the instant matter—notwithstanding that the burden to demonstrate standing rests on Plaintiff alone.  Even still, the Court came up empty in its search.

[16] To the extent that Plaintiff's allegations can be construed as objecting to the very tables that he failed to complete, such objections could have—or, more accurately *should* have—formed the basis for a pre-award rather than post-award bid protest.  *See, e.g.*, Amend. Compl. at 8 (Plaintiff alleging it is "unreasonable and incoherent when an offeror cannot read the solicitation and easily calculate their own bids due to the overwhelming number of contradictions, circular statements, and lack of quantities and units in the summary table of the bid schedule and lack of annual sum totals for the other tables B.1 and B.3. . . ."); ECF No. 17 at 1 (Plaintiff alleging "there was a substantial chance that our firm would have received the award if there were not serious problems with the solicitation.").  Plaintiff's first protest regarding the instant solicitation did not occur until October 22, 2018, days after NASA publicly announced its award decision.  While the Court finds dismissal necessitated on standing alone, the government is correct that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  As Plaintiff did not file any pre-award protest with the agency, GAO, or in this Court, he generally cannot now seek relief for alleged errors, "contradictions, circular statements," or other errors in the solicitation—unless they became apparent only after the award decision was made.